UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-60117-CR-LEIBOWITZ

UNITED STATES OF AMERICA,

    Plaintiff,
v.

SANJAY SINGH,

    Defendant.
_____/

## THE DEFENDANT'S PSI OBJECTIONS

The Defendant, Sanjay Singh, by and through undersigned counsel and pursuant to Fed. R. Crim P. 32, hereby submits his objections to the Presentence Investigation Report (the "PSI").

### A.    Objections to "Guidelines Manual: 2024"

On Page 1 of the PSI, the Report states that it is applying the 2024 Federal Sentencing Guidelines. Its decision to do so is erroneous. The 2024 Guidelines included an amendment to §2B1.1 in the form of a note that stated "Loss is the greater of actual loss or intended loss." *See* 2024 USSG §2B1.1, "Notes to Table" at (A). The guidelines in effect at the time of the offense did not include such a note and, as discussed more fully below, the plain language of the 2021 Guidelines requires that "loss" means "actual loss." Because the actual loss at issue here is much lower than the PSI's estimated intended loss, the application of the 2024 Guidelines increases the sentence Mr. Singh is likely to receive. Accordingly, applying the 2024 Guidelines violates the *ex post facto* clause. *See Peugh v. United States*, 569 U.S. 530, 550 (2013)

("[T]he *Ex Post Facto* Clause forbids the [government] to enhance the measure of punishment by altering the substantive 'formula' used to calculate the applicable sentencing range." That is precisely what the amended Guidelines did here." (internal citations omitted)).

B.      **Objections to Offense Conduct**

- **Objections to Paragraphs 9–43**

Because Mr. Singh maintains his innocence, Mr. Singh objects to the PSI's discussion of Royal Bengal Logistics ("RBL") operating as a fraudulent investment scheme.

- **Objection to Paragraph 9**

In Paragraph 9, the PSI notes that the case involves "close to 2,000 victims." In fact, as the government presented through the testimony of Paul Lopez, the number of investors was not ascertainable by the Receivers, but insofar as an estimate was presented, it was much lower than that mentioned in the PSI. *See* Tr. Day 9 at 102:20–22 ("Well, as we came to learn immediately, there were, at a minimum, over 1,000, perhaps 1,500 investors that we came to learn had invested in the company."). Because the loss amount and number of investors suffering "substantial financial hardship" is dependent on how many of the losses are attributed to each investor, the issue regarding the number of investors is relevant to the inquiry.

- **Objections to Paragraphs 12**

In Paragraph 12, the PSI notes that "initially, the funds were raised from individual investors who sent money and received promised returns in their own

individual names.  However, on an unknown date, the defendant and his unindicted co-conspirators requested that the investments be made through companies that were either pre-existing corporations linked to investors or investors who opened a corporate entity at the instruction of RBL personnel." It further states that the "change to the use of corporate entities for investment concealed the source and nature of the funds flowing into and out of bank accounts held by RBL." *Id.* This statement is factually incorrect—the first trucks purchased on behalf of investors were purchased in the names of corporate entities. *See* Gov. Ex. 119-59 ("Fleet Management Sheet").  The PSI appears to be referring not to the truck investment program but to the "owner-operator" program, in which trucks already owned by investors could be lent to RBL to operate the over-the-road trucking business.  In addition, it is unclear how investors utilizing publically listed LLCs, registered with their respective states, in any way "concealed the source and nature of the funds."

- **Objections to Paragraph 18**

In Paragraph 18, the PSI notes that RBL "never initiated the process of obtaining a truck for the large majority of truck program investors." This is factually incorrect.  As detailed in the "Asset Intake" spreadsheet, admitted at trial as Defense Exhibit S-1, RBL maintained a detailed history of its efforts to purchase trucks on behalf of investors.  These included multiple calls to multiple investors to submit loan documents as well as multiple efforts to help obtain financing on behalf of truck program investors.  While it is true that many investors did not receive trucks, the evidence presented shows that RBL was persistent in its efforts to obtain trucks for investors.

- **Objections to Paragraph 22**

In Paragraph 22, the PSI describes the commingling of funds that occurred at RBL and notes that RBL "routinely and pervasively used these commingled investor funds for undisclosed and unauthorized purposes." Because the contracts investors signed were largely silent as to how the funds would be used, however, it is unclear what this paragraph is referring to. While the long term trucking contracts did state that the down-payment would be used "in part" for the purchase of a truck, the short-term contracts made no mention of use of funds. Because the contracts did not specify how the funds would be used, no use could be deemed "unauthorized."

- **Objections to Paragraph 25**

In Paragraph 25, the PSI notes that, in November 2022, Mr. Singh told investors that RBL had at that time "received approximately $16,500,000 from investors and had paid out about $21,000,000 to investors," when "in truth, RBL's bank records reflected that it had actually received over $60,000,000 from investors" at that time. This paragraph refers to Gov. Ex. 15-12, but misstates the video at issue. In the video, Mr. Singh states clearly that RBL had received $16,500,000 in "asset management"—thus referring to the truck program. Then, Mr. Singh says that investors "*collectively*" have made $21 million." In the video, Mr. Singh is comparing the incoming cashflow from *truck* investors and the outgoing cashflow to *all* investors. This is important because, as Mr. Kapila testified at trial, the Receivers have been unable to segregate funds from long- and short-term investors. *See* Oct. 31 Tr. at 123:2–5 ("Q: At no time did you attempt to segregate the number of funds that were owed to long-term investors versus short-term investors, right? A: That's

4

correct."); *id.* at 148:16–19 ("Q: We also discussed that you didn't segregate from the total investor funds the long-term funds from the short-term loans; right? A: Correct.").

### C. Objections to Obstruction of Justice Enhancement

- **Objections to Paragraph 45–49**

Mr. Singh objects to the PSI's application of the Obstruction of Justice Enhancement. The PSI raises three bases for the application of this enhancement: (1) Mr. Singh's communications with M.M., in which Mr. Singh expressed interest in leasing land managed by M.M. in Lubbock, Texas; (2) Mr. Singh's representations to the Court that he was indigent at the August 11, 2023 arraignment hearing; and (3) Mr. Singh's post-arrest stock trading in the amount of $8,890.50 dollars and post-arrest financial transfers to his sister. Whether viewed separately or together, none of these actions constitute obstruction of justice as contemplated by the Federal Sentencing Guidelines.

1. Begin with Mr. Singh's communications with M.M. First, as this Court found at trial—when the government attempted to introduce said evidence—these communications are not relevant to the charged conduct, and did not rise to the level of witness tampering. Maintaining one's innocence while one is cloaked in the presumption of innocence is certainly not "obstructing justice." Nor is expressing interest in a future lease agreement for land managed by a witness. Nowhere in those communications did Mr. Singh attempt to influence the testimony of M.M., or place any undue pressure on her decision whether or not to testify in this matter. Second, the government, through AUSA Kiran Bhat, requested, and the defense agreed to, a

provision in Mr. Singh's bond providing that Mr. Singh was not to have contact with certain witnesses involved in the case. The government provided that list to Mr. Singh's (at that time) privately retained defense counsel on June 22, 2023. M.M. is not on the list, contrary to the PSI's assertion that she is, so any communications between Mr. Singh and M.M. were not, as the PSI suggests, "in contradiction of a court order."[1]

    2.    Consider next the PSI's assertion that Mr. Singh provided false information to obtain the services of the public defender. There are multiple problems with this theory of obstruction of justice. First, it is unclear from the record whether Mr. Singh ever actually provided false or misleading information. Second, even if the Court finds the representations misleading, the government cannot prove the misstatements were "willfully" provided. Third, and perhaps most importantly, whether an individual is represented by the public defender or private counsel has nothing to do with the "the defendant's offense of conviction and any relevant conduct [or] a closely related offense."

First, consider that Mr. Singh provided the court with a bounty of evidence regarding his finances at both his initial appearance and at his arraignment, when he was finally assigned the services of the public defender. In Mr. Singh's pre-trial services interview on June 22, 2023, Mr. Singh disclosed *millions of dollars* in cash

---

[1] Mr. Bhat requested, when providing the no-contact list to defense counsel, that it not be publically disseminated. For that reason, it is not attached here. But defense counsel will have copies available for the Court, the government, and the Probation Office at the sentencing hearing, and will file said list publically if requested by the Court.

6

and assets.  He disclosed hundreds of thousands of dollars in stocks, millions of dollars in a private checking account, the ownership of multiple properties, the ownership of a vehicle, and the ownership of multiple tractor-trailers and associated inventory.  He also, critically, disclosed a monthly draw of business income.  At that time, he was not appointed the public defender.

That same day, however, while Mr. Singh was being interviewed, the Court in RBL's civil case placed a freeze order, at the SEC's request, on Mr. Singh's bank accounts.  *See SEC v. RBL, Inc.*, Case No. 23-61179 [ECF No. 10] (June 21, 2023) While that Order ostensibly applied to *all* bank accounts, it specifically listed a number of accounts subject to the freeze order.  Both Mr. Singh and AUSA Bhat understood that Order to apply only to the accounts listed in the order, as evidenced by comments made at Mr. Singh's arraignment.  *See* Aug. 18, 2023 Tr. at 7:16–20 ("Mr. Bhat: I think the amount that the government has holds on in terms of accounts is far more than 35,000.  So I'm not sure if Mr. Singh is saying that he has $35,000 accessible *that are not frozen* or whether he's saying that that's the amount he believes to be encumbered.") (emphasis added); *id*. at 4:2–4 ("Mr. Bhat: There is a separate SEC action, Judge, before Judge Singhal. *Most of his accounts, if not all of his accounts, I believe are frozen pursuant to that action.*") (emphasis added).  This confusion over which accounts remained subject to the freeze order was only amplified by Judge Altonaga's Order on September 27, 2023, in which Judge Altonaga ordered that Mr. Singh continue utilizing personal bank accounts for the purpose of remaining employed.  *See* [ECF No. 33] ("Defendant is required to obtain employment and is permitted to receive and deposit funds into a bank account, as conditions of his

bond."). Put simply: the freeze order was interpreted by all parties involved—Mr. Singh, Mr. Bhat, and the Court—to involve some, but not all, of his accounts.

After the freeze order was put in place, Mr. Singh appeared for his arraignment, at which he was appointed the services of the public defender. During the colloquy, Mr. Singh informed the Court that he had at least $35,000 available to him to pay for an attorney. *See* Aug. 18, 2023 Tr. at 7:23–8:2. Despite this representation, the Government did not object to the appointment of the public defender (even when asked directly by Judge Hunt if they objected to the appointment), and the Court appointed the public defender.

Due to the confusion surrounding the scope of the freeze order, as well as the government's non-opposition to the appointment of the federal public defender despite knowledge of the $35,000 dollars available to him at the time, this Court should not conclude that Mr. Singh misrepresented (willfully or otherwise) his financial status to the Court.

More importantly, however, statements regarding indigency are not related to the "offense of conviction." In asking for the enhancement to apply, the government appears to be relying on the Eleventh Circuit's decision in *United States v. Ruff*, 79 F.3d 123 (11th Cir. 1996). There, the Court found that statements made to a magistrate judge regarding financial status *did* qualify as obstruction of justice. But that decision was decided under the 1993 Sentencing Guidelines, and those Guidelines did not require that the obstruction be related to the "offense of

8

conviction."[2] The Eleventh Circuit reiterated this position in *United States v. Hitt*, 164 F.3d 1370 (11th Cir. 1999). But that case was decided under the 1997 Sentencing Guidelines, which included identical language.[3] And while both *Hitt* and *Ruff* have been cited approvingly in post-amendment decisions, those decisions were not published, and are thus not binding on this Court. *See, e.g.*, *United States v. Malone*, 454 F. App'x 711, 714 (11th Cir. 2011).

The guidelines have since been amended to make clear that, for the enhancement to apply, the conduct at issue must not only obstruct or impede the "administration of justice," but must also be related to "the defendant's offense of conviction and any relevant conduct [or] a closely related offense." And whether Mr. Singh is represented by the public defender or a private attorney has nothing to do with the offense at issue. Under the plain language of the guidelines at issue, the enhancement does not apply.

3. Lastly, the PSI notes that, because Mr. Singh engaged in financial transactions after his arraignment, including a transfer of $80,000 dollars to his

---

[2] *See* 1993 Federal Sentencing Guidelines, §3C1.1 ("If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels."), available at https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1993/manual-pdf/Chapter_3.pdf.

[3] *See* 1997 Federal Sentencing Guidelines, §3C1.1 ("If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels."), available at https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1997/manual/CHAP3.pdf.

9

sister on August 11, 2023, and stock trading in the amount of $8,890.50 dollars in December 2023, the obstruction enhancement should apply. It is unclear why this conduct is relevant to §3C1.1. These transactions do not relate to the "investigation, prosecution, or sentencing of the instant offense of conviction." The commentary notes to § 3C1.1 include a non-exhaustive list of conduct that falls under the guideline, and engaging in post-arrest financial transactions before any finding of guilt does not even remotely relate to any of the conduct listed. As noted above, the scope of the freeze order in place at the time was interpreted by all parties as applying to some accounts but not others. The financial accounts listed in the PSI are not listed in that freeze order. And by the time these transactions were made, Judge Altonaga had already specifically ordered Mr. Singh to maintain his personal bank account as a condition of bond. Moreover, the PSI engages in pure conjecture in concluding that these transfers were effectuated "most likely with profits of his conduct following his instant arrest." Characterizing these transactions as a willful obstruction of the administration of justice is thus a gross misrepresentation of their nature.

It is also worth noting that, at the November 27, 2023 hearing mentioned in this section, Judge Altonaga found that Mr. Singh was *not* fully indigent, and ordered Mr. Singh to make partial indigency payments to contribute to his defense. *See* [ECF No. 42] ("The Court finds that private funds are available for payment by the Defendant for partial reimbursement for the cost of court-appointed counsel."). Given this finding, any misrepresentation made (the PSI engages in conjecture again in suggesting a misrepresentation *was* made at that hearing—a hearing, it should be

noted, neither of the AUSAs currently on the case attended, *see* [ECF No. 41]), the misrepresentation is one of degree, and should not be found material. Even $80,000 would not be enough to hire an attorney to represent Mr. Singh in a case that will take eighteen months from indictment to sentencing, and took five weeks to try.

### D. Objections to Loss Amount Calculation

- **Objections to Paragraphs 9, 55**

In a stunning repudiation of the evidence presented at trial, the PSI calculates the loss amount in this matter at $160,000,000, resulting in a staggering 26-level sentencing enhancement. The PSI does so by making two errors. First, it applies an "intended loss" calculation, rather than an "actual loss" calculation, contrary to the plain meaning of the guideline in place at the time of the offense. *See* ¶ 55. And second, it includes in the calculation *every dollar* raised from investors, rather than the loss they suffered. *See* ¶ 42. This Court should reject both decisions.

a. *Actual v. Intended Loss*

The 2021 Guidelines[4] that govern make clear that "loss" is "actual loss" not "intended loss." Here, however, the PSI eschews the actual loss amount on the basis of either guideline commentary in the 2021 Guidelines, or the amended above-the-line provision in the 2024 Guidelines. Because the text of the applicable guideline provision, USSG § 2B1.1, itself is clear and makes no allowance for an enhancement

---

[4]*See Peugh v. United States*, 569 U.S. 530, 550 (2013) ("[T]he *Ex Post Facto* Clause forbids the [government] to enhance the measure of punishment by altering the substantive 'formula' used to calculate the applicable sentencing range." That is precisely what the amended Guidelines did here." (internal citations omitted)).

11

based on "intended" loss, this decision is erroneous. And under the Eleventh Circuit's recent *en banc* decision in *United States v. Dupree*, 57 F. 4th 1269 (11th Cir. 2023), reliance on any guideline commentary to the contrary is improper.[5]

Section 2B1.1(b)(1) of the Sentencing Guidelines provides for incremental enhancements of an accused's offense level corresponding to the amount of "loss" incurred. Notably, the guideline itself makes no mention of "intended loss." Only in the commentary to the guideline is a sentencing court invited to utilize the "greater of the actual loss or intended loss," *id.* at Note 3(a), despite that the latter term is found nowhere in the text. Pursuant to *Dupree*, this Court should not defer to the commentary because "the term 'loss' is unambiguous in the context of § 2B1.1 and because the loss enhancement commentary improperly expands the Guideline." *United States v. Banks*, 55 F.4th 246, 253 (3d Cir. 2022).

In *Banks*, the Third Circuit addressed a challenge to a loss enhancement. The court reasoned that "[t]he Guideline does not mention 'actual' versus 'intended' loss; that distinction appears only in the commentary. That absence alone indicates that the Guideline does not include intended loss." *Id*. at 257. It then considered the dictionary definition of "loss," concluding that the "ordinary meaning of 'loss' in the context of § 2B1.1 is 'actual loss.'" *Id*. The court ultimately concluded that "in the context of a sentence enhancement for basic economic offenses, the ordinary meaning

---

[5] The Court in *Dupree,* applying the Supreme Court's analysis in *Kisor v. Wilkie*, ___ U.S. ___, 139 S. Ct. 2400 (2019), concluded that absent an ambiguity in the text of a guideline, the commentary to that guideline is not deserving of deference.

12

of the word 'loss' is the loss that the victim actually suffered." *Id*. at 258.  Its holding "accord[ed] the commentary no weight." *Id*.

This Court need not look beyond the Southern District of Florida to find a similar result.  In *United States v. Patel*, No. 19-CR-80181-RAR, (S.D. Fla. Aug. 23, 2023), Judge Ruiz too grappled with a loss amount challenge.  Unsurprisingly, Judge Ruiz first considered *Dupree's* impact on his analysis, recognizing that, "if a guideline is unambiguous, 'there is no plausible reason for deference' to the commentary, and the court must apply the guideline's unambiguous meaning."  *Id*. at 2 (quoting *Dupree*, 57 F.4th at 1275).  Then, citing *Banks*, Judge Ruiz found that "'loss only has one possible meaning: actual loss," *id*. at 4, thereby rejecting the government's suggestion that "loss," as used in § 2B1.1(b)(1), is ambiguous. Notably, Judge Ruiz eschewed any consideration of the guideline's context or purpose as he found that he was "bound by § 2B1.1's plain text[.]" *Id*. at 5.

"Loss" in the context of § 2B1.1(b)(1) unambiguously means actual—not intended—loss.  Resorting to the commentary is therefore not only unnecessary but, after *Dupree*, forbidden.  As is applying the intended loss metric on the basis of the 2024 Sentencing Guidelines.

      b. *Loss Calculation*

More troubling is the PSI's computation of the $160,000,000 figure.  The PSI makes clear that it reaches this figure by adding up *every dollar* RBL received from investors.  Under any metric of "loss"—actual or intended—this is a gross overestimation of the loss occasioned here.  Indeed, even if this Court finds that the Guidelines' reference to "loss" is ambiguous as to whether the term includes

13

payments returned to investors, thereby necessitating the application of Note 3(F)(iv), which states that "loss shall not be reduced by the money or the value of the property transferred to any individual investor in the scheme in excess of that investor's principal investment," the evidence presented at trial makes clear that the government made *no effort* to segregate payments to investors into "principal" and "interest" buckets, meaning that the government cannot carry its burden of showing *any* payment returned to investors was in excess of their initial principal. And in fact, the defense is prepared to show that *every witness* with a long-term trucking contract who testified at trial did not receive a single dollar in excess of their initial investment up until the moment a truck was actually purchased.

Recall that at trial, the government presented evidence that RBL took in around 158 million dollars from investors and paid back around 105 million. *See* Gov. Ex. 119-23 ("Investor Loss . . . (53,699,867)"). Even this metric, however, does not account for the assets on the books of RBL at the time the business was shut down—assets that could have been liquidated (and will be liquidated) to make further payments to investors. *See* USSG §2B1.1, comment (n.3(E)(i)) (noting that estimation of loss amount should take into account "money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected."); *id.* at comment (n.3(E)(ii)) (noting that estimation of loss amount should take into account "the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing"); *see also United*

14

*States v. McKanry*, 628 F.3d 1010, 1019 (8th Cir. 2011) (finding in mortgage fraud case that loss amount was correctly calculated as "the difference between the unpaid principal balance of the twelve mortgages and the *subsequent sales price* of the properties") (emphasis added); *United States v. Cavallo*, 790 F.3d 1202, 1235–36 (11th Cir. 2015) ("The sentencing guidelines, therefore, require foreseeability of the loss of the unpaid principal, but do not require foreseeability with respect to the *future value* of the collateral.") (emphasis added).

During the cross-examination of Paul Lopez at trial, he testified that the land owned by RBL in Pompano, Florida was sold for 3.2 million dollars. *See* Oct. 30 Tr. at 100:12–14. He further testified that one of the properties in Lubbock, Texas was sold for $829,000. *Id.* at 101:8–11. He testified that a second property was sold for $200,000. *Id.* at 101:19–20. And that a third property was sold for around $200,000. *Id.* at 102:14–16. He further testified that he learned that RBL had acquired ownership interests in several businesses, including an airline and a flight school. *Id.* at 103:5–8. While he was unable to value those interests, he did testify that money was transferred to those business after contracts for the purchases were signed. *See id.* at 103–104. According to Gov. Ex. 119-24, $300,000 was transferred to Riya Enterprises pursuant to a contract wherein RBL would acquire a 50% share of a flight school. He also testified that, at the time he took over as Receiver, RBL had 2.4 million dollars of cash on hand. *See id.* at 109:13–110:6. He also testified that, at the time he took over as Receiver, he turned away a shipment of trailers that RBL had built in India without ascertaining the value, *id.* at 76:1–10, that RBL had purchased $320,000 in tools that were liquidated, *id.* at 83:6–9, that RBL had purchased a diesel

refueling station that he abandoned, *id.* at 71:9–12, and that he liquidated the office equipment owned by RBL.

Even *excluding* the trailers, the business interests, the refueling station, the tools, and the office equipment, this means that almost $7,000,000 in assets was available to pay back investors when he took over as the Receiver of RBL.

What is more, the government's calculation of the $54,000,000 loss amount does not include the value of the actual tractors and trailers that were returned to investors. Only one witness testified as to the value of their trucks—D.C.—who testified that he sold three trucks and one trailer for $60,000 to a former RBL employee. The government introduced evidence at trial that RBL had possession of 267 trucks at the time the Receivers took over, as well as an additional 54 trailers. *See* Gov. Ex. 119-59. Because these were either returned to investors or abandoned by investors and left to RBL, the liquidation value of the tractors and trailers was also available to pay back investors.

Just as importantly, the government is unable to segregate which portion of the monies paid back to investors were out of *principal* and which were *interest payments*. The great majority of the contracts at issue were long-term, trucking contracts. And as Mr. Kapila testified at trial, these contracts provided a 21-month "runway", during which all payments to the investor could be made out of his initial down-payment. *See* Nov. 4 Tr. at 161:14–18. Combine this with the fact that the government agrees that RBL generated 18 million dollars in revenue during its five years of operating history, *see* Gov. Ex. 119-22, and that monies owed on the long-term trucking contracts would come due over a rolling five-year period, and

determining what percentage of payments made to investors were "principal" and which were "interest" becomes nearly impossible. In any event, the analysis has not been done.

***

From the perspective of computing the loss amount, this is a very unique case. There is no question that, during the course of its history, RBL did in fact run an actual over-the road trucking business that acquired over 200 tractor-trailers and generated more than 17 million dollars in revenue. The "gain" attributable to Mr. Singh is estimated by the government at 4.4 million dollars. *See* Gov. Ex. 119-24. And even when all disbursements to entities affiliated with Mr. Singh are taken into account, the "gain" is estimated by the government at around 13 million. *See id.* Even this figure is overstated—as it includes millions of dollars of payments to an American Express card that government witnesses testified uniformly was used only for business expenses, millions of dollars for a land purchase that the Receivers were able to recoup, and hundreds of thousands of dollars that were paid to entities pursuant to business agreements between those entities and RBL. Indeed, even when RBL's own trading losses are added to the figure, the government's evidence shows a gain of 21 million dollars. *See* Gov. Ex. 119-33.

The purpose of the loss amount is to determine the "reasonably foreseeable pecuniary harm that resulted from the offense." USSG §2B1.1, comment (n.3(A)(i)). It is meant to determine what the "defendant knew or, under the circumstances, reasonably should have known was a potential result of the offense." *Id.* at (n.3(A)(ii)). Holding Mr. Singh accountable for a 160 million dollar loss amount

here—or even the 54 million dollar loss amount the government argued at trial—would be inconsistent with that purpose given the breadth of RBL's trucking business.

This Court should reduce the loss amount by the value of the business assets and ownership interests held by RBL at the time of Mr. Singh's arrest, the principal returned to RBL's investors, and the value of the 267 tractors and 54 trailers held by RBL but owned by investors at the time of sentencing. If that figure "reasonably cannot be determined" after the government's presentation of evidence, the Court utilize its discretion under USSG §2B1.1, comment (n.3(B)) to utilize "gain" in place of "loss" and calculate the loss amount at the 21 million dollar figure argued by the government at trial.

## CONCLUSION

Mr. Singh respectfully requests that the aforementioned PSI objections be sustained. If the Court assigns the 21 million dollar "gain" figure as the loss amount, the adjusted offense level would be calculated as 40, resulting in a guideline sentence of 292-365 months.

Respectfully submitted,

HECTOR DOPICO
FEDERAL PUBLIC DEFENDER

By: /s/ *Victor Van Dyke*
   Victor Van Dyke
   Assistant Federal Public Defender
   Florida Special A No.: A5503021
   150 W. Flagler Street, Suite 1700
   Miami, Florida 33130-1556
   Tel: (305) 530-7000
   E-mail: victor_vandyke@fd.org

**CERTIFICATE OF SERVICE**

  I HEREBY CERTIFY that on **February 11, 2025**, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

           By: /s/ *Victor Van Dyke*
             Victor Van Dyke